Filed 9/12/13  In re B.R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re B.R., a Person Coming Under the Juvenile Court Law. | B247409 (Los Angeles County Super. Ct. No. CK90111) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  MARTHA G.,  Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Jacqueline Lewis, Juvenile Court Referee.  Affirmed.

Judy Weissberg-Ortiz, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jeanette Cauble, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

\* \* \* \* \* \*

Martha G. (Mother) appeals from a Welfare and Institutions Code[1] section 366.26 order terminating her parental rights to her daughter, B.R. Mother claims the trial court abused its discretion in denying her section 388 petition and committed reversible error in failing to apply the section 366, subdivision (c)(1)(B)(i) exception to termination of parental rights. We affirm the order terminating parental rights.

### FACTUAL AND PROCEDURAL BACKGROUND

On October 24, 2011, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of newborn B.R. The petition was sustained under section 300, subdivisions (b), (d) and (j). As sustained the petition alleged that B.R.'s father, A.R. (Father), sexually abused B.R.'s eight-year-old sibling J.L.,[2] by fondling J.L.'s vagina. Mother failed to take action to protect J.L. when she knew of Father's sexual abuse of J.L. Mother continued to allow Father to reside in J.L.'s home and to have unlimited access to J.L. The sexual abuse of J.L. by Father and Mother's failure to protect J.L. endangered B.R.'s physical health and safety, and placed B.R. at risk of physical harm, damage, danger and sexual abuse.

At the time of B.R.'s detention, a detective from the Juvenile Division in Parker Center indicated that the sexual abuse allegations were being investigated. J.L. was detained prior to B.R.'s birth. The department detained J.L. after the department received a referral on September 23, 2011 indicating J.L. was telling different neighbors and Mother that Father had been molesting J.L. for a while. J.L. would point to her vagina and state that Father inserted his finger into her vagina and made her get naked. When J.L. told Mother, Mother told J.L. to stay away from Father.

Prior to B.R.'s detention, the department met with Father, who stated he was living with a family member. However, he failed to provide an address of the family

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] J.L. is not a party to this appeal. B.R. and J.L. are half-siblings. J.L. was placed with her father. The juvenile court terminated jurisdiction with a family law order granting J.L.'s father sole physical custody and joint legal custody with Mother.

2

member. The department suspected that Father was living with Mother at the time. The department went to Mother's home on October 19, 2011.[3] Mother stated she had not seen Father in a week. Father was paying the rent and all the bills. He still had clothing, a tooth brush, and his working materials in the home. Mother eventually admitted Father was in the home that morning and had "just left." Mother acknowledged Father had substantial contact with B.R., which placed B.R. at risk of sexual abuse. The department informed Mother of the risk of abuse to B.R. due to the substantiated allegation against J.L. Mother stated: "I did not know [J.L.] was abused."

The jurisdiction/disposition report stated B.R. was in foster care. The report gave further details about the sexual abuse. J.L. stated that Father and she were sitting in a vehicle and playing catch with a ball of Play-Doh. The ball went between her legs. Father tried to retrieve the ball and J.L. scooted back. J.L. told him "no" when he told her to unbuckle her pants. She eventually took off her pants because he told her he was going to check to see if she was sick. Father was checking her legs and getting closer to her private parts. He told her to take off her underwear. J.L. told him "no" and put her pants back on. Father reached inside her pants and touched her vaginal area for about five seconds. Father told her not to tell anyone. J.L. told Mother about the incident. Mother got angry and did not talk to Father. Mother told J.L. not to get close to Father or play with him. Mother told J.L. that if Father did it again Mother would get him out of the house.

Mother initially denied any knowledge of sexual abuse of J.L. by Father. But, when the social worker confronted Mother with J.L.'s statements to the department, Mother admitted knowledge of the abuse. J.L. disclosed Father had touched her vagina. J.L. told Mother about the incident in the car about a year before the detention. According to Mother, J.L. did not like Father. J.L. did not make any further accusations against Father. Mother did not allow J.L. to be alone with Father. J.L.'s adult sister L.S. cared for J.L. while Mother worked. Mother stated she did not leave Father because she

---

[3]     The record states September 19, 2011. However, this must be an error because B.R. was not born yet.

was pregnant and needed his support. Mother said she depended on Father "100 [percent]." After B.R. was born, Father was Mother's sole source of support.

Mother denied ever telling the emergency services social worker Father had done anything inappropriate with J.L. Mother also denied statements by her adult daughter, L.S., that L.S. had confronted Mother about the abuse. Mother said she did not believe J.L. and that it was an accident. Mother said Father was only joking when he had offered to give J.L. gum if she took off her pants.

Father denied that anything happened in the car. According to Father, he took the ball away and nothing else happened. Father blamed Mother's adult daughter for J.L.'s accusations. Father was having problems with the adult daughter.

On October 24, 2011, the juvenile court ordered B.R. detained in foster care. The parents were given monitored visits. The case was continued for mediation and adjudication concurrently with J.L.'s case.

The department filed an interim review report for hearing on November 16, 2011. The report stated B.R. was placed with foster parents J.E. and D.E. On October 17, 2011, Mother was given a packet of referrals for court ordered programs. The department was assessing maternal aunt Maria G.'s home for possible placement of B.R. Mother and Father had continued to visit B.R. since the last court hearing on October 24, 2011. The visits were monitored. There were no issues or problems. Mediation did not resolve the matter.

On December 6, 2011, in a last minute information for the Court, the department reported Father was arrested on November 16, 2011 on a felony charge for lewd and lascivious acts on a child under the age of 14. Father remained incarcerated and an immigration hold had been placed on him.

On December 6, 2011, the juvenile court sustained the allegations that Father sexually abused J.L. and Mother failed to protect B.R. from the risk of harm. The juvenile court removed B.R. from the parents' custody. Reunification services were ordered. The parents continued to have monitored visits. Mother was ordered to

4

participate in sexual abuse awareness counseling and individual counseling to address the case issues.

For a June 5, 2012 status review hearing, the department reported that seven-month-old B.R. had been residing with her maternal aunt since January 25, 2012. No problems or concerns were reported. There was initially some concern that B.R. had facial features indicative of fetal alcohol syndrome. But, B.R. was reported to be in good health and developmentally on track.

In November 2011, after Father was incarcerated, Mother lived in the home alone. Mother reported having a roommate in December 2011. She indicated that her therapist thought it was best to have a roommate to help with expenses and emotional support. The roommate also had an open dependency case. By June 2012, the roommate was in the process of moving out.

On November 15, 2011, Mother enrolled in individual counseling to address sexual abuse awareness. She completed 16 individual counseling sessions. The therapist reported Mother openly participated. Mother was cooperative, responsive, respectful, active and punctual. She also participated in parenting classes. Mother reported that the therapy was helpful. It educated her about sexual abuse. Mother said that she thought sexual abuse meant "extreme cases of rape." She now understood there are different types of sexual abuse. Mother indicated she was raised in a small town and was unaware of what sexual abuse was. Mother explained that she had learned she needed to protect her children from any type of sexual abuse. On March 9, 2012, Mother received certificates of completion for attending a "Spiritual Enrichment Program." She also attended 12 parenting classes and received a parenting certificate.

Father had been released from incarceration on February 28, 2012. He did not complete nor enroll in any court ordered services after he was released. Father stated he had been cleared of all criminal charges. He continued to deny that he sexually abused J.L. Father was living with Mother, who stated she was concerned about his well-being. Mother said he acted "strange" after his release from jail and thought he needed therapy. The department gave Father mental health referrals.

While B.R. was in foster care, Mother had consistent twice weekly visits. After B.R. was placed with the maternal aunt, the visits were increased to three times a week. The visits went well. The maternal aunt indicated Mother brought B.R. clothes, fed her and changed her diapers. B.R. recognized Mother and would start smiling or laughing when she saw her. The maternal aunt stated B.R. would get excited when Mother visited.

The social worker observed Mother's May 2, 2012 visit with B.R. Mother picked up B.R. and talked to her. B.R. smiled at Mother and laughed while Mother held her. B.R. also smiled and laughed when the social worker said her name or talked to her. There were no concerns with Mother's visits.

On April 3, 2012, Mother stated that she wanted to reunify with B.R. Mother was willing to leave her relationship with Father in order to reunify with B.R. Father stated he was willing to take the classes and programs to reunify with B.R. He was willing to leave the home to do so.

The department conducted a reassessment regarding whether B.R. could be returned to Mother. The department concluded the risk level remained very high for future abuse or neglect. Although Mother had partially complied with the case plan, she continued to doubt J.L.'s disclosure of sexual abuse. Mother's therapist indicated Mother "does not either accept or admit the disclosure of sexual abuse" by J.L. On April 3, 2012, Mother told the social worker she was not going to say the sexual abuse did or did not happen. According to Mother, a lot of different things contributed to the situation. Mother was not willing to "take sides."

The department reported B.R. would be at risk if Mother was given custody because she was living with Father. The risk of abuse remained very high if B.R. was reunited with Father. He had not complied with the case plan. Father continued to deny he sexually abused J.L. Because he would not take responsibility for his actions, B.R. would be at risk if she was returned to his care. The department recommended the juvenile court terminate family reunification services and schedule a section 366.26 permanent plan hearing.

6

On June 5, 2012, the department filed a last minute information for the court which reported Mother had moved out of the home and was no longer living with Father. Father had enrolled in a "Spiritual Enrichment Program." He enrolled in individual counseling on April 9, 2012. The matter was continued to July 24, 2012 for a contested hearing.

At the contested hearing, the juvenile court entered into evidence two department reports, the department's delivered service logs, and a progress report from Father's sexual abuse treatment program. Father had completed 12 individual sessions and would complete 12 more at his attorney's suggestion. The department argued neither parent had accepted what happened even though they participated in programs. The department requested the juvenile court terminate unification services. B.R.'s attorney agreed that termination of reunification services was warranted because neither parent had made progress in their treatment programs. Mother requested additional reunification services. Her attorney reminded the juvenile court that Mother was no longer living in the same house with Father.

The juvenile court stated it could not find there was a substantial probability that B.R. could be returned to her parents' custody by the 12-month date. The court noted that after completing a sexual abuse awareness program, Mother allowed Father to move back into the home. The court further noted that Mother's recent move from the home did not persuade the court that Mother "in any way, gets, understands, or is willing to protect [B.R.] from the risk." The court also found that Father's lack of progress was based on "complete denial of the sex abuse here." The court then terminated reunification services for both parents. The matter was set for a section 366.26 permanent plan hearing on November 20, 2012.

For the permanent plan hearing, the department reported B.R. had been placed in the home of Mr. and Mrs. B. on August 30, 2012. B.R. was removed from the maternal aunt's home after discussions with the department. On June 21, 2012, the social worker asked the maternal aunt if she would adopt B.R. The maternal aunt stated that her

7

husband said no. Neither she nor her husband wanted to take B.R. away from Mother. They both thought B.R. should be returned to Mother.

B.R. was assessed as adoptable. She was healthy, "a quick learner, very smart, and easy to care for." However, she was being assessed for some possible delays in her motor skills. B.R. was becoming attached to her caregivers and had adjusted to her new routine. B.R. turned to the caregivers for assistance in getting her needs met. B.R. was thriving in the home. The caregivers had an approved adoptive home study. The caregivers had become attached to B.R. and "would love to adopt her." The department reported there were no concerns with the parents' consistent visits with B.R.; but neither parent had a parental role with B.R. Rather, B.R. was provided with stability and had her needs met by the caregivers. The department concluded adoption was in the best interests of B.R. The department recommended termination of parental rights. The matter was set for a contested hearing on January 8, 2013.

On January 8, 2013, Father filed a section 388 petition. He claimed changed circumstances on the ground he had participated in and completed a sexual abuse treatment program. In support of his changed circumstance petition, Father testified that B.R. was removed from his care because he "refused to leave the house when [he] was ordered to leave the house." When asked about the underlying allegations, he stated: "I was accused of touching [Mother's] daughter." When asked if he touched J.L., Father responded: "Well, yes. I did accept that I made a mistake." He participated in a parenting program and individual sexual abuse therapy. In individual counseling, he learned about how people become addicted to sex. Father was asked how this knowledge related to his behavior with J.L. He explained: "Well, that your mind wanders and thinks things up regarding that, and your mind really goes further out there, and you want to do things that are not right." He learned that sexual abuse occurs when an adult person tries or wants to abuse a minor or a physically weaker person. Before Father completed his testimony, the juvenile court continued the matter to January 16, 2013.

On January 15, 2013, Mother filed a section 388 petition. She alleged that she continued to participate in individual counseling. Mother attached a copy of the

8

therapist's progress report. The progress report states that Mother attended seven sessions since November 17, 2012. Mother cited language from the progress report, which indicated she "verbalized an increased knowledge of how the perpetrator has used manipulation before, during and after the abuse to influence the attribution of the crime, furthermore, she appears to be able to manage risk factors at home while implementing a corrective plan." However, the progress report also states Mother initially did not believe J.L. But, as she progressed in therapy, Mother had been "able to identify and objectively examine the evidence as it emerged." And Mother had demonstrated an inclination to follow court orders.

Mother requested six additional months of reunification services. She alleged that the change was in B.R.'s best interest because Mother visited consistently and B.R. appeared to have a bond with Mother. Additional reunification services would allow the bond to solidify and allow B.R.'s placement with her biological mother.

The juvenile court set a hearing on Mother's section 388 for January 16, 2013. On January 16, 2013, Father resumed his testimony. Father denied being in a relationship with Mother or living with her. Father denied that they went together to visit B.R. When asked if he sexually abused J.L., Father stated: "That is what I am accused of, and I already accepted that, yes, yes, that it is right." He indicated what is right meant "that I tried to do what they are accusing me of." Father indicated that it is an "allegation" or "accusation" that he tried to sexually abuse J.L. when he was "playing with her in the pickup." According to Father, he was "told" he had to admit that it was true. His daughter B.R. would not be at risk because she was his daughter and, if he had a bad thought, the classes had made him see that it was not proper. On cross-examination, Father explained that he and J.L. were playing and throwing items at each other. Some Cheetos fell on top of her legs and he tried to grab them. Father denied touching her private area. He said it was a "misinterpretation about everything that happened."

The juvenile court found that there were no change of circumstances and it was not in B.R.'s best interest to grant Father's section 388 petition. Father's section 388 petition was denied. Mother then submitted on her section 388 petition without

9

additional evidence or argument. B.R.'s counsel argued there was no change. Mother only got into her program after reunification services had started; but, there were no real changes. And, it was not in B.R.'s best interests to reinstate reunification services even though the parents visited regularly because it was only one hour a week. The department asserted the circumstances "might be changing" as opposed to "changed." Because B.R. was doing well in her current placement, it was not in her best interests to grant the petition.

The juvenile court denied Mother's section 388 noting that B.R., who was 15 months old, had been out of her parents' care since birth. The juvenile court found that the circumstances were not "changed" but "perhaps" were "changing."

The juvenile court then proceeded with the section 366.26 hearing and admitted the November 20, 2012 section 366.26 report into evidence. The parties did not produce any other evidence. B.R.'s counsel argued no exception to termination of parental rights existed. Mother and Father objected to termination of parental rights.

The juvenile court found B.R. adoptable. The court further found it would be detrimental to B.R. to return her to the parents' custody and no exception to adoption applied. The court then terminated parental rights and freed B.R. for adoption. Mother filed a timely notice of appeal.

## DISCUSSION

### I.     The Section 388 Petition

Mother contends the juvenile court abused its discretion in denying her section 388 petition. Section 388 provides in part: "(a)(1) Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall be verified and . . . shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction."

10

Section 388, subdivision (d) provides in part: "(d) If it appears that the best interests of the child . . . may be promoted by the proposed change of order, modification of reunification services, custody, . . . termination of jurisdiction, . . . the court shall order that a hearing be held and shall give prior notice, or cause prior notice to be given, to the persons and in the manner prescribed by Section 386, and, in those instances in which the manner of giving notice is not prescribed by those sections, then in the manner the court prescribes."

The question here is whether the juvenile court abused its discretion in determining it was not in the child's best interests to reopen Mother's reunification services. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Because Mother's section 388 modification petition was filed after reunification services were terminated and the section 366.26 selection and implementation hearing had been set, the focus of the proceedings had shifted from the parents' interest in the care, custody and companionship of the child to the child's best interests. (*In re Stephanie M.*, *supra*, at p. 317; *In re Janee J.* (1999) 74 Cal.App.4th 198, 211.) Mother's request for change must be viewed in the context of the dependency proceedings as a whole. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528.) The juvenile court's focus is on the child's needs for permanency and stability. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447; *In re Marilyn H.*, *supra*, at p. 309.)

The juvenile court concluded Mother had not demonstrated "changed" circumstances. The record showed Mother did not believe J.L.'s account of the incident which brought the family before the juvenile court. In December 2011, the juvenile court sustained allegations that Mother failed to protect B.R.'s sibling from sexual abuse by Father. Significantly, Mother subsequently completed individual counseling and parenting classes concerning the sexual abuse of J.L. as part of the case plan. But, after claiming enlightenment from court-ordered therapy, she reverted back to denying or expressing skepticism that Father had sexually abused her young daughter. Mother then allowed Father to move back into her home after he was released from incarceration

11

claiming she was "concerned" for him. Thus, the juvenile court did not abuse its discretion in determining that the circumstances were not "changed."

Moreover, the juvenile court acted within its discretion in determining Mother did not establish it was in B.R.'s best interests to reinstate reunification services. B.R. had been a dependent of the court since she was approximately two weeks old in October 2011. B.R. never reunified with Mother. Instead, B.R. has been living in foster homes since she was two weeks old. Although the child appeared to be happy when Mother visited, the visits only lasted for one hour. When the child was not having visits with Mother, the child was described as happy and emotionally stable.

Mother's modification request was made on the date of a continued section 366.26 permanent plan hearing. She asserted the juvenile court should reinstate reunification services on the basis of Mother's continued attendance in therapy. But, "[c]hildhood does not wait for the parent to become adequate." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) And, nothing about this record shows it was in the child's best interests to reinstate Mother's reunification services because she was attempting to become adequate at this late stage of the proceedings. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Marilyn H.*, *supra*, at pp. 309–310.) A child's best interests and need for stability are not promoted by delays in the selection of a permanent home for child when there have been numerous failures to reunify with the child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47; *In re Edward H.* (1996) 43 Cal.App.4th 584, 594.) The juvenile court did not abuse its discretion by refusing to prolong the proceedings on the basis of Mother's additional participation in therapy.

## II. The Exception to Termination of Parental Rights

Mother does not claim B.R. was not adoptable. Rather, Mother also claims the juvenile court committed reversible error "because substantial evidence did not support the finding that the section 366.26, subdivision(c)(1)(B)(i), exception did not apply."

At a section 366.26 hearing, if the child is likely to be adopted, the preferred permanent plan is adoption. (*In re Celine R.* (2003) 31 Cal.4th 45, 53; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) The burden is shifted to the parent to raise any

12

relevant exception in the juvenile court.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 553; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402–403.)  The party asserting an exception has the burden of producing evidence showing it applies.  (*In re Celine R.*, *supra*, at p. 61; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  Mother did not raise the regular parent visitation and benefit to child exception nor did she produce any evidence supporting the exception in the juvenile court.  The department is correct that Mother's failure to do so results in a forfeiture of the argument on appeal.  (*In re Erik P., supra*, at pp. 402–403.)

Even if counsel's objection to termination of parental rights was sufficient, there is no reversible error.  There is some discrepancy between appellate courts as to the standard of review for a determination as to whether an exception to termination of parental rights applies.  Some courts have applied the substantial evidence standard of review to the determination of whether an exception exists.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 297–298; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [the determination of whether an exceptional circumstance exists is customarily challenged for sufficiency of evidence].)  Other courts have applied an abuse of discretion standard.  (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1342 [abuse of discretion applied to determination of whether parent-child exception existed]; see also *In re T.S.* (2009) 175 Cal.App.4th 1031, 1038 [Indian child exception].)  A kind of hybrid standard of review has been applied by some courts.  (*In re C.B.* (2010) 190 Cal.App.4th 102, 122–123; *In re Bailey J.*, *supra,* 189 Cal.App.4th at pp. 1314–1315.)  Under this standard, the juvenile court has discretion to resolve whether a statutory exception exists such that termination of parental rights would be detrimental to an adoptable child.  (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1322; *In re Jasmine D., supra,* at p. 1342.)  However, the juvenile court's pure factual findings are reviewed for substantial evidence.  (*In re C.B.*, *supra*, at p. 122; *In re Jasmine D.*, *supra*, at p. 1351.)  It has been held, however, that any practical differences between the two review standards are not significant.  (See *In re C.B.*, *supra*, at p. 123; *In re Jasmine D.*, *supra*, at p. 1351.)  In any event, the record does not show reversible error.

13

Mother claims she established the exception by showing regular and consistent visitation during which she changed B.R.'s diapers. In determining whether the exception applies, the juvenile court should consider: the age of the child; the portion of the child's life spent in the parent's custody; the positive and negative interaction between the parent and the child; and the child's particular needs. (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1206; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

"In the context of the dependency scheme prescribed by the Legislature, . . . the 'benefit from continuing the [parent/child] relationship' exception [means] the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Thus, Mother was required to show she occupied a parental role rather than had a mere friendship with B.R. (See, e.g., *In re Brittany C.* (1999) 76 Cal.App.4th 847, 854; [parents must show at least one biological parent occupies a parental role rather than a friendship]; *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108–1109 [parents are required to establish more than "'frequent and loving contact'" or an "emotional bond"

14

accompanied by pleasant visits but must show "parental role"].) But, Mother produced no evidence that her relationship with B.R. provided "the daily nurturing that marks a strong parent-child relationship." (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)

At the time parental rights were terminated, B.R. was 15 months old and had been living in foster care since she was less than two weeks old. Even though B.R. was smiling and happy during Mother's visits, she was described as happy when she was not with Mother. Mother had not provided for B.R.'s daily needs and care for B.R.'s entire life. The juvenile court did not err in terminating parental rights given the absence of evidence showing "the existence of such a strong and beneficial parent-child relationship" which "outweighs the child's need for a stable and permanent home." (*In re Casey D., supra,* 70 Cal.App.4th at p. 51.)

## DISPOSITION

The order terminating parental rights is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

FERNS

We concur:



_____, P. J.

BOREN


_____, J.

CHAVEZ

_____

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15